UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,       )
                                )
                                )       CRIMINAL ACTION NO.
v.                              )       11-10199-DPW
                                )
RAZVAN PASCU,                   )
                                )
                Defendant.      )


MEMORANDUM AND ORDER
June 26, 2012

     Razvan Pascu moves to exclude from evidence all items seized

during a search of a vehicle he was using on April 30, 2011.  I

will deny Pascu's motion.

## I.  FINDINGS OF FACT

     Following a full evidentiary hearing and consideration of

the submissions of the parties, I make the following findings.[1]

A.   Background

     In early 2011, law enforcement intelligence developed

information that a group of Romanians were targeting certain ATM

machines that were vulnerable to "skimming," a form of theft

whereby a device is fitted over an ATM's card slot and a camera

---

[1]  As will be apparent from these findings of fact, I largely
credit the testimony of the law enforcement agents.
Specifically, I do not credit Pascu's contentions that he does
not understand English, and that he was never asked to give
consent to a search.  There are, to be sure, certain
inconsistencies within and among the testimony of the officers
specifically as to the first search of the vehicle.  Regardless,
I find the basic and material testimony of the officers to be
largely consistent.

is hidden nearby, which respectively capture the data from a user's debit card's electromagnetic strip and the individual's PIN number.  The information from the card's strip and the individual's PIN number then can be used to create a clone debit card which grants the user the ability to make unauthorized withdrawals from the original debit-card owner's bank account. In the spring of 2011, the New England Electronic Crimes Task Force was investigating the string of "skimming" incidents in the region.  A number of the Cambridge Police Department officers involved in Pascu's April 30, 2011, arrest testified that they were either involved with the Task Force, or were aware of the rash of "skimming" incidents at the time.

B.    The April 30 Search

    1.    _Suspicions Reported_

    At approximately 2 p.m. on April 30, 2011, the Cambridge Police Department received a call reporting a suspicious man at the Eastern Bank ATM that was located in the Fresh Pond Mall in Cambridge.  The caller reported that the suspicious individual was wearing a brown vest, blue sweater, jeans, and sunglasses, and was repeatedly entering and exiting the ATM location, putting his hood and sunglasses on before entering and removing them upon exiting.  The caller reported seeing the man carrying a satchel, and after leaving the ATM location the man would enter a gray 2009 Chrysler 300 with New York license plate FHW 4206.  The

suspicious individual would then drive a lap around the perimeter of the mall, re-park in the same spot, get out, and reenter the ATM location.

### 2. *Initial Police Encounter with Pascu*

Officer Steven Allen responded to the dispatcher's call, and drove to the location. Upon arriving, Officer Allen was approached by the individual who had called the report in to the police; he identified the suspicious person as Pascu, who was on his cell phone on the sidewalk outside of the shopping mall, and the gray Chrysler 300 as a vehicle parked near the end of the lot. Officer Allen approached Pascu, and asked him if he could talk to him. Pascu said yes, and Officer Allen asked him what he was doing there. Pascu claimed to be meeting Roberta, a woman he had met in New York, at 2:30[2] in the Fresh Pond Mall parking lot. Officer Allen asked to see some identification, and Pascu produced a Romanian passport in the name of Razvan Pascu. Although Pascu was Romanian and had an accent, Pascu spoke to Officer Allen in English throughout their entire conversation.

### 3. *Additional Officers Arrive*

Approximately five minutes after Officer Allen began speaking with Pascu, four other officers---Officers Dave Gamble, Glenn Marshall, Matthew Price, and Marlin Rivera---arrived in

---

[2] Officers testified that they were with Pascu past 2:30 p.m. that day, and no one identifying herself as "Roberta" ever arrived.

police vehicles, also in response to the dispatcher's initial
call. Officer Allen relayed what Pascu told him to the other
officers, who began searching the area for the sunglasses and
satchel that had been identified in the caller's tip.

While the officers searched for the sunglasses and satchel,
Officer Allen remained with Pascu. Officer Allen talked to Pascu
about Roberta. Although Pascu was to contact Roberta by
telephone, Pascu told Officer Allen that he could not remember
her phone number; that it was not stored in his phone; and that
he did not know how she was getting to the parking lot in
Cambridge from New York. Officer Allen concluded Pascu was being
evasive; he then frisked him and read him his Miranda rights.

During the frisk, Pascu removed his cell phone from his
pocket, and someone placed it on the nearby police cruiser. One
of the officers removed Pascu's car keys from his pocket and
placed them with his passport on top of the cruiser, next to his
cell phone.[3]

After the frisk, a woman attempted to use the Eastern Bank
ATM, but it malfunctioned and failed to return her debit card.
Officer Allen understood that such malfunctions were associated

[3]  The record is unclear about who performed the frisk and took
the keys, and when this occurred, but I find that the testimony
of the officers as a whole establishes that during the frisk an
officer took Pascu's keys and identification and placed them on
top of the police cruiser after Officers Allen, Gamble, Marshall,
Price, and Rivera had arrived on the scene, but before any
detectives arrived.

with ATM skimming devices, and prevented other people from using the ATM.

### 4. *Initial Auto Searches*

Following the frisk, Officer Rivera took the car keys, unlocked the Chrysler, and began searching it for the sunglasses and shoulder bag.[4]  Detectives Brian Hussey and Kevin Donofrio arrived to assist shortly after Officer Rivera began his search. Detective Hussey joined in, and removed a parking ticket and a piece of paper from the glove compartment.  He placed them on the front seat of the car and told Officer Rivera of his discovery. The detectives were unable to find the satchel or sunglasses that had been identified by the caller and left the scene after approximately 10 minutes.

Officer Price observed Pascu's car being searched and inquired whether the officers had obtained Pascu's consent.  They responded that they had not.  Officer Price told them to stop searching the car and returned to Pascu to get his consent.  When Officer Price asked Pascu if he could have permission to search the car, Pascu said yes.  Officer Price did not observe that Pascu had any trouble understanding him.

---

[4]  The testimony was somewhat unclear whether Officer Rivera was alone in searching the car before Pascu gave his consent. Officer Rivera testified he was with another officer, but could not remember who.  Detective Hussey testified that he drove over to the car and saw Officer Rivera searching it, but did not testify to seeing Allen.  Officer Price testified that he saw both Officer Rivera and Officer Allen searching the car.

Officers Price and Allen then returned to Pascu's vehicle and began searching it. Officer Price searched the front passenger's side of the vehicle, and Officer Allen searched the front driver's side, but neither found the satchel. After a few minutes, they gave up the search and Officer Price called for detectives to assist in the investigation. Before the detectives arrived, Officers Rivera, Gamble, and Marshall left the scene.

### 5. *The Search of the ATM Vestibule*

Around 3:00 p.m., Detectives David Atherton, Brian O'Connor, and Thomas Flynn arrived on the scene in response to Officer Price's request. The detectives searched the ATM vestibule for evidence that the machine had been tampered with, and Detective O'Connor recognized that something unusual was sticking out of the ATM's card-slot. After unsuccessfully attempting to remove it, Detective O'Connor called the bank's fraud department to get access to the bank surveillance photos and to have a branch manager come inspect the ATM for tampering. The branch manager inspected the ATM and noticed that it looked altered. When Secret Service agent Brett Seidel arrived sometime later, he was able to remove the "skimmer" from the ATM. He also found a pinhole camera attached to the ATM which would capture individuals' PIN numbers as they entered them on the ATM's keypad.

While Detectives Atherton, O'Connor, and Flynn were waiting for the Secret Service agent to arrive, an officer handed Detective O'Connor a piece of paper with handwritten notes found in Pascu's glovebox.  The paper, which I find was the product of the initial unconsented-to search of the Chrysler, appeared to list a number of addresses.  O'Connor looked up the addresses on his laptop and discovered that some of them were other ATM locations in Massachusetts.

Meanwhile, Detective Flynn had been having a conversation in English with Pascu.  They spoke over a period of approximately two hours about various topics, such as music, cars, and Pascu's job.  The only time that Pascu expressed difficulty understanding Detective Flynn was when Detective Flynn asked Pascu for Roberta's phone number.  When Detective Flynn dialed the number for Roberta that Pascu gave him, a construction company's answering machine picked up.  When Detective Flynn confronted Pascu about this, Pascu said he could not understand what Detective Flynn meant by "construction company."  Prior to that statement, Pascu had been telling Detective Flynn about his job in Romania driving the owner of a construction company's personal vehicle, and had described the owner's business as a "construction company."  Detective Flynn found this and other aspects of Pascu's story inconsistent with other evidence.  For

7

example, Pascu told Detective Flynn that while he had been waiting for Roberta, he went to the T.J. Maxx store in the shopping mall to look at luggage. However, when Detective Flynn looked at the T.J. Maxx surveillance tapes, he was unable to find any evidence that Pascu had entered the store.

### 7. *Further Consent Search of Automobile and Further Development of Evidence*

After the detectives searched the ATM vestibule, Officer Allen asked for Pascu's consent to search his vehicle again. Pascu said yes, and this time Officers Allen and Price searched Pascu's vehicle for "skimming" devices that could be used on the ATM. Officer Price searched the passenger compartment and found a Romanian passport in the glovebox belonging to Ionut Alexandru Moiceanu and several slips of paper with handwritten addresses on them.

Around the same time, Detective O'Connor received an email from the bank's fraud department with surveillance photos from the ATM earlier that day. The photos were of Ionut Alexandru Moiceanu, wearing sunglasses and carrying a black satchel. The photos showed Moiceanu approach the ATM on two separate occasions. The fraud department sent a second set of photos to Detective O'Connor which showed Pascu in the same ATM vestibule.[5]

---

[5]  I find that the caller saw both Moiceanu and Pascu entering and exiting the ATM vestibule, and conflated the actions of the two men, ascribing them to a single individual---Pascu---whom he identified to police.

Officer Price turned over three additional slips of paper he found while searching the car. Detective O'Connor confirmed that some of the addresses on those slips of paper were other ATMs in the area which were the same model as the one that had been compromised at the Fresh Pond Mall location.

### 8.  *Pascu is Arrested*

Pascu was then formally placed under arrest and brought to the Cambridge police station.[6] At 7:54 p.m., Pascu was booked at the Cambridge Police Department.[7] Because Pascu had mentioned that he spoke Italian, Officer DeSimone was brought in to conduct some portions of the interview in Italian.

Meanwhile, Pascu's automobile was subjected to an inventory search which uncovered a computer in the spare tire compartment of the trunk, a GPS, and a cell phone. After the inventory was completed, the car was brought to the tow yard.

## II.  DISCUSSION

The Fourth Amendment bans searches and seizures that are unreasonable. *Terry v. Ohio*, 392 U.S. 1, 9. Unless one of the exceptions to the warrant requirement applies, searches conducted

---

[6] None of the officers recalled the precise time Pascu was placed in handcuffs and brought to the Cambridge police station. Nearly all, however, estimated that they had been in the mall parking lot for between three and four hours before Pascu was taken to the station, which would be sometime after 5:00 p.m. and before 7:00 p.m.

[7] The parties agree that it is unclear from the record whether 7:54 p.m. was the end or the beginning of the booking.

without a warrant supported by probable cause are presumed to be unreasonable. *United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011).

Pascu argues that the evidence found in the Chrysler 300 should be suppressed because (A) his detention at the Fresh Pond Mall amounted to an arrest without probable cause; (B) the searches of the car were without consent or probable cause; and (C) any purported consent that was obtained was involuntarily given and the illegality of the earlier searches tainted later searches, including the search of the vehicle after it was towed.

A.  Pascu's Detention at the Mall was Lawful and was not a De Facto Arrest

Pascu contends that Officer Allen's initial stop and the officers' continued engagement with him was an invalid de facto arrest.  Pascu thus contends that all subsequent searches of his vehicle were tainted and the evidentiary fruits of those searches must be suppressed.

As an initial matter, Pascu is incorrect that a stop had occurred under *Terry v. Ohio* stop when Officer Allen first approached Pascu.  The First Circuit has noted that the Fourth Amendment is not drawn into play when officers simply approach individuals in public to ask questions. *United States v. Ford*, 548 F.3d 1, 4 (1st Cir. 2008).  Here, Officer Allen approached Pascu and asked his permission to talk to him.  Pascu said "yes." Officer Allen's initial conversation with Pascu was consensual

and did not implicate *Terry*, at least until Officer Allen frisked Pascu some time later. *United States v. Smith*, 423 F.3d 25, 30 (1st Cir. 2005) ("We conclude that under the totality of these circumstances, Smith was not seized prior to his arrest. Although the two officers were armed, neither drew his weapon at any time. Neither officer ever touched Smith. They did not accuse him of any crime, or attempt to question him about a specific event. When they exited their car, the officers merely approached Smith requesting his identification, or even just his name. Such a non-threatening request does not elevate an otherwise consensual encounter between a citizen and the police into a seizure.").

I conclude Officer Allen's subsequent frisking of Pascu marked the beginning of a *Terry* stop. Under *Terry v. Ohio*, an officer is permitted to detain an individual if, under all of the facts known to the officer at the time, he has reasonable suspicion to believe that a crime has been committed. 392 U.S. 1, 21-22 (1968). A police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the search. *Id.* at 21. A frisk may be conducted in connection with such a detention only if the officer has reasonable grounds for believing that the person stopped poses a danger to the officer's safety. *Id.* at 28; *cf. United States v. Am*, 564 F.3d 25, 30-32

(1st Cir. 2009).  Any frisk must be limited to a weapons search and not more generally for other evidence of crime.  *Terry*, 392 U.S. at 29-32.

Here, Officer Allen knew that there had been a rash of "skimming" fraud at ATMs in the New England region.  Dispatch had received a tip from a caller about a suspicious individual who had repeatedly entered an ATM vestibule in Cambridge, exited it, drove a lap around the perimeter of the shopping mall in his car, re-parked the car, and reentered the ATM vestibule.  The caller also provided a description of the appearance of and clothing on the individual and described the make, model, and color of the vehicle.  When Officer Allen arrived at the scene, the caller identified himself and then re-identified the same features of Pascu's vehicle, clothing, and physical appearance.  Taken together, this information would give rise to an officer's reasonable suspicion that an ATM "skimming" fraud was ongoing at the Fresh Pond Mall involving Pascu, the individual identified by the caller.

While there was plainly sufficient evidence to detain Pascu, there was no basis to frisk him.  Nothing about the crime under investigation or about Pascu's appearance suggested the safety concerns which can justify a *Terry* stop frisk.  I will return to the significance of this circumstance when discussing access to

Pascu's phone and car keys.  Nothing else of direct or derivative
evidentiary significance resulted from the frisk.

Pascu next contends that the length of the stop converted
the *Terry* stop into an arrest that, in order to be valid, was
required to be supported by probable cause.  Because he claims no
such probable cause existed, Pascu argues that the fruits of the
search of his vehicle must be suppressed.

There is no bright line to mark the point at which a *Terry*
stop becomes an arrest.  *Id.* at 20.  The test, instead, is
whether under the totality of the circumstances, "a reasonable
person in the suspect's position would have understood [his]
position 'to be tantamount to being under arrest.'"  *United
States v. Chaney*, 647 F.3d 401, 409 (1st Cir. 2011) (citation
omitted).  "Where an investigatory stop is justified at its
inception, it will generally not morph into a de facto arrest as
long as 'the actions undertaken by the officer[s] following the
stop were reasonably responsive to the circumstances justifying
the stop in the first place as augmented by information gleaned
by the officer[s] during the stop.'"  *Id.* (citation omitted).

A reasonable person in Pascu's position would not have
understood himself to be under arrest.  Other than the length of
time of the encounter and a premature administration of *Miranda*
warnings, none of the traditional indicia of arrest were present
until he was formerly placed under arrest.  Pascu was never put

into handcuffs during questioning or the investigation, he was not put into a police car, and he was not taken to the police station until he had been formally arrested. Although there were a number of officers in the area, they were not surrounding Pascu or otherwise intimidating him. Instead, they were searching the area, the ATM vestibule, and the Chrysler 300 for evidence. The officers uniformly testified that Pascu seemed calm and had a relaxed demeanor, except when asked to give officers details he was unable to produce about Roberta, who never arrived, neither at 2:30 p.m. or any time thereafter. Pascu was at ease; he recommended a music band to Detective Flynn and talked to him about cars, and smiled for the camera when his photo was taken by Detective O'Connor at the scene.

Pascu nevertheless argues that the duration of the stop was unreasonable. Pascu was first stopped sometime after 2 p.m., and was formally arrested by all accounts some three or four hours later. From the testimony of the officers, it appears that all of the time between the beginning of the encounter and the formal arrest was reasonably necessary to the developing investigation related to the initial *Terry* stop. Officer Allen needed time to assess what was going on when he first stopped Pascu and started speaking to him. As Pascu gave answers about what he was doing there and whom he was meeting, Officer Allen had reason to believe that Pascu's answers were not truthful and were evasive.

14

When other officers arrived, Officer Allen had to get them up to speed about what was happening and they began searching for the satchel and sunglasses that had been reported by the caller.

Detectives who later arrived had to call bank security to get confirmation that the ATM appeared tampered with and to get surveillance photographs to determine whether Pascu was the individual who had installed the "skimmer" device and pinhole camera on the ATM. Detective O'Connor needed time to view the photographs and to cross-reference addresses found in the Chrysler with other ATMs in the region. Finally, because the detectives were unable to remove the "skimmer" from the ATM, they had to wait until Special Agent Seidel arrived and removed it. All of these investigative steps were "reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop." *Chaney*, 647 F.3d at 409 (quotation and citation omitted). Pascu's lawful *Terry* detention did not become a de facto arrest because of its duration.[8]

Finally, Pascu argues he was not free to leave because his identification was taken from him. Pascu cites *Florida v. Royer*

---

[8] As noted above, it is unclear why Pascu's booking did not occur until 7:54 p.m. if he was placed into handcuffs sometime after 5:00 p.m. and before 7:00 p.m. One possibility, alluded to by the parties, is that the 7:54 p.m. time stamp on Pascu's booking sheet represented the end of his booking, not the beginning. In any event, Pascu does not challenge the delay in his booking, only the duration of the stop itself.

460 U.S. 491 (1983), in which the Supreme Court held that officers had de facto arrested someone at an airport when they took away his checked luggage, driver's license, and airplane tickets. *Id.* at 493-94. *Royer* is inapposite, however. As the First Circuit has noted, the concerns in cases involving *Terry* stops in airports are different from those *Terry* stops that occur elsewhere. *United States v. Ford*, 548 F.3d 1, 6 (1st Cir. 2008). Although the fact that Pascu's identification was taken is a factor in de facto arrest analysis, the First Circuit has "decline[d] to elevate it above other considerations." *Id.*

Pascu also claims that his car keys were taken from him. As noted above, I have found that an officer did in fact take Pascu's car keys from him during the improper *Terry* frisk.[9] However, that his car keys and identification were sitting on top of the police cruiser next to where he was standing and talking to officer does not mean that a reasonable person would not think they were free to leave at that point. As noted above, all of the other circumstances suggested that Pascu was not under arrest. Pascu freely conversed with officers in the parking lot

---

[9] Pascu alleged in an affidavit filed just before the motion to suppress hearing that officers "put [him] against the police car and searched [him]. They took car keys from my pocket and went straight to the car, opened it, and took papers and a computer from it." However, Pascu did not testify during the motion to suppress hearing, and I have not considered his affidavit, which he declined to make subject to cross examination by choosing not to testify, in making my findings of fact in connection with this motion.

about work, music, and women in his life.  While a number of
officers initially arrived on the scene, only one or two spoke to
Pascu at a time while the rest performed other tasks or, as the
majority of them did within the first hour, left the scene.
Pascu was relaxed and smiled for the camera when his photo was
taken by Detective O'Connor.

Pascu was also never physically restrained.  He was never
handcuffed or put in the back of a police cruiser.  He could have
walked away from the scene, and if he needed to return to New
York, there were a number of public transportation options that
were available to him.  That his car keys were taken from him as
he emptied his pockets during the *Terry* frisk is only one piece
to be weighed against these considerable indicia that Pascu was
not under arrest.  And, as noted in the next section, that his
car keys were taken from him does not obviate the voluntariness
of the independent consent Pascu repeatedly gave to officers to
search the Chrysler.

B.  Pascu Gave Officers his Consent to the Relevant Car Searches

Although the Fourth Amendment generally requires that
officers obtain a warrant before searching a Fourth-Amendment-
protected area, no warrant is required to conduct a search if an
individual voluntarily consents to the search.  *Chaney*, 647 F.3d
at 405-06.  A court looks to the totality of the circumstances in
determining voluntariness, including the suspect's "age,

17

education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." *United States v. Marshall*, 348 F.3d 281, 286 (1st Cir. 2003). It is the government's burden to prove consent by a preponderance of the evidence. *United States v. Jones*, 523 F.3d 31, 37 (1st Cir. 2008).

It is evident from the record that officers failed to obtain Pascu's prior consent for the first search of the Chrysler 300 which produced the handwritten note with the ATM locations on it. Officer Price, himself an attorney, testified that when he asked the officers searching the Chrysler whether they had obtained Pascu's consent, they acknowledged that they had not and he directed them to stop. And, as noted above, the officers who frisked Pascu and took his car keys and phone did so in violation of *Terry*, because there was nothing about Pascu's appearance or actions which implicated the safety concerns which can justify a *Terry* frisk.

While this initial search and the *Terry* frisk were not proper, they yielded nothing of direct[10] or derivative evidentiary value. Moreover, Officer Allen had more than adequate reasonable suspicion to continue his investigation without reliance upon the paper with the list of locations found

---

[10] The Government has represented it will not offer the fruits of the first search at trial.

in the vehicle. All subsequent searches of the car were voluntarily consented to, as discussed below, and therefore the substantial evidence found in the Chrysler during later searches does not need to be suppressed.

The totality of the circumstances support a finding that Pascu's later consents were given voluntarily. Pascu is an adult with considerable practical life experience. Officers reported that he was calm and cheerful throughout the detention (especially when discussing his favorite band, The Gipsy Kings, and cars). He demonstrated a skewed but nevertheless considered perspective on the American justice system when he claimed that he had only been stopped "because he was white" and that "blacks walk around" like he had been doing. Pascu was given *Miranda* warnings before granting his consents to search his car. *See Jones*, 523 F.3d at 37 (noting that one factor for the totality of circumstances analysis is whether the defendant was given *Miranda* warnings). Officers testified that Pascu was friendly, and he is clearly smiling in a picture Detective O'Connor took at the mall. Although no officer testified that Pascu had been informed of his right to refuse consent, that factor is not determinative when weighed against the remainder of the circumstances. *See Chaney*, 647 F.3d at 407-08 (noting that although a failure to advise a defendant of his right to refuse consent to a search is relevant to the totality of the circumstances analysis, the First Circuit

has repeatedly held that it "does not automatically render such consent invalid" (citation omitted)). Given that there is no evidence in the record of coercive tactics on the part of officers to obtain Pascu's consent---Pascu was not mistreated, officers never brandished their weapons, no threatening gestures were made nor were threatening words spoken---the totality of the circumstances support the finding that Pascu gave his consent to officers voluntarily.

Although Pascu now claims not to understand English, the record satisfies me that he had a sufficient understanding of the English language to appreciate the meaning of his words in consenting to requests to search the Chrysler. Over the entire three-to-four hour period, Pascu spoke English with the officers. Every officer, when asked, said that Pascu did not demonstrate difficulty understanding their questions. Indeed, he seemed more than willing to converse with officers in English about a wide range of subjects, such as his favorite music artist (correcting one officer's spelling of the band The Gipsy Kings), his wife and child in Romania, his vacation in New York City, his job driving the owner of a construction company in Romania, his wife's Greek restaurant in Germany, and the horsepower of Detective Flynn's police car. It is evident from the officers' reports and the booking video that Pascu only expressed difficulty understanding English when he was caught in a contradiction.

Pascu's consent was not tainted by the earlier illegal search of his Chrysler. As Pascu admits, no one told him about the previous search or that his car keys had already been used to open the car before he consented to additional searches. Pascu does not cite any case supporting the proposition that a consent can be tainted by facts unknown to the defendant at the time he grants consent. The only two cases Pascu cites, *United States v. Santa*, 236 F.3d 662 (11th Cir. 2000) and *Holloway v. Wolff*, 482 F.2d 110 (8th Cir. 1973), involved defendants who knew of the earlier illegal search, and are not on point.

I reject Pescu's claim that his consents were not voluntarily given. *See, e.g.*, *United States v. Gamez-Acuna*, 375 Fed. App'x 809, 815 (10th Cir. 2010) (holding that a defendant's consent was voluntary where the defendant was able "to provide a wide range of information" such as "his name, date of birth, travel plans, employment, family situation, and biographical information"); *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999) (holding that where a defendant conversed at length with an officer about his travel plans, reason for the trip, and the duration of the trip, any limitations on the defendant's ability to understand English did not vitiate the voluntary consent he gave an officer to search his vehicle). Thus, his consents obviate the need to suppress any fruits of the searches of the Chrysler.

C.  The Discovery of the Evidence Was Not Tainted

    1.  *Inevitable Discovery*

    Even assuming, *arguendo*, that Pascu's consent was not

voluntarily given, the inevitable discovery doctrine saves the

officers' searches of the Chrysler.  Under that doctrine,

evidence that "would inevitably have been discovered without

reference to the police error or misconduct" need not be

suppressed.  *Nix v. Williams*, 467 U.S. 431, 448 (1984).  Evidence

would have been inevitably discovered if "(i) the lawful means of

its discovery are independent and would necessarily have been

employed, (ii) discovery by that means is in fact inevitable, and

(iii) application of the doctrine in a particular case will not

sully the prophylaxis of the Fourth Amendment."  *United States v.*

*Zapata*, 18 F.3d 971, 978 (1st Cir. 1994).

    The evidence in the Chrysler would inevitably have been

discovered under at least two exceptions to the warrant

requirement.

    First, officers had developed probable cause to believe that

the vehicle contained evidence of the ATM "skimming" fraud once

Detective O'Connor and the Secret Service agent found the ATM

card skimmer and pinhole camera, and therefore could search the

Chrysler pursuant to the "automobile exception."[11]  That

_____

[11]  The "automobile exception" would also provide an independent
ground for upholding the officers' search of the Chrysler quite
apart from the "inevitable discovery" doctrine.  For analytical

exception provides that "if there is probable cause to believe a vehicle contains evidence of criminal activity, agents can search without a warrant any area of the vehicle in which the evidence may be found." *United States v. Polanco*, 634 F.3d 39, 42 (1st Cir. 2011) (quotations and citations omitted). Probable cause to search requires simply a "fair probability," well short of certainty, that evidence of criminal activity will be found in a particular place. *Safford Unified Sch. Dist. v. Redding*, 557 U.S. 364, ----, 129 S. Ct. 2633, 2639 (2009).

Officers had probable cause to believe the Chrysler contained evidence of the ATM "skimming" fraud. As noted above, officers were aware that an ATM "skimming" ring was operating in the area. A number of the officers and detectives on the scene were members of the New England Task Force assigned to investigate those ATM frauds. Upon discovering the ATM skimmer and pinhole camera, the officers could reasonably expect that other instrumentalities of ATM skimming, such as a laptop computer, would be necessary to collect and transport the data from the skimmer and pinhole camera. Officers had evidence from the caller that the individual going into the ATM vestibule had a satchel which they were unable to find and had returned to a 2009 Chrysler 300 with license plates FHW 4206 after leaving the ATM

---

consistency, however, I treat the doctrines as interrelated in this circumstance.

vestibule.  The caller then identified both Pascu and the Chrysler on the scene to Officer Allen.  It therefore was reasonable for the officers to conclude that there was a "fair probability" that both the instrumentalities of ATM skimming and the satchel were inside the Chrysler.

Detective O'Connor and Secret Service Agent Seidel had nothing to do with the initial unconsented-to search of the Chrysler, consequently the ATM skimmer and pinhole camera evidence provide independent grounds for searching the car. Allowing such a search would not undermine the "prophylaxis of the Fourth Amendment" because it would not "provide an incentive for police officer misconduct." *See United States v. Silvestri*, 787 F.2d 736, 744 (1st Cir. 1986).  Thus, because the articles collected from the Chrysler would inevitably have been discovered under the automobile exception, the fruits of the searches (even assuming they were without consent originally) need not be suppressed.

Second, under the search-incident-to-arrest exception to the warrant requirement, officers could search the Chrysler after Pascu's arrest if it was "reasonably likely" to contain evidence of the crime.  A pre-condition of any such search is that Pascu's arrest was valid.  Arrests without a warrant must be supported by probable cause. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) ("A warrantless arrest of an individual in a public place for a

felony . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause."). Although the probable cause standard is a "practical, nontechnical conception," *Illinois v. Gates*, 462 U.S. 213, 231 (1983), and is "incapable of precise definition," *Pringle*, 540 U.S. at 371, the main thrust "of all the definitions of probable cause is a reasonable ground for belief of guilt . . . particularized with respect to the person to be searched or seized." *Id.* (quotations and citations omitted).

Officers had reasonable grounds, hence probable cause, to arrest Pascu. The caller (who later re-confirmed the details of his call in person to Officer Allen) identified Pascu as the individual going into and out of the ATM vestibule who was putting his hood up and shielding his face from cameras. Once Detective O'Connor and Special Agent Seidel found the ATM skimmer and pinhole camera, given Pascu's evasive answers to officers' questions during the unquestionably valid *Terry* phase of the investigation, police had probable cause to arrest Pascu for tampering with the ATM.

Pascu's arrest, in turn, made discovery of the items in the Chrysler inevitable under the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement. The Supreme Court held in *Arizona v. Gant*, 129 S. Ct. 1710 (2009), that "an automobile search may fall within the search-incident-to-arrest

doctrine only in two very specific situations: 'when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search' (the officer-safety justification), or 'when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle"' (the evidence-preservation justification)." *Polanco*, 634 F.3d at 42 (quoting *Gant*, 129 S. Ct. at 1719 (citation omitted)).

The search of the Chrysler fits under the "evidence-preservation justification." For the reasons similar to those identified in support of application of the automobile exception pre-arrest, the search-incident-to-arrest exception would allow officers to search the Chrysler after Pascu was taken into custody.[12] As above, assuming *arguendo* that Pascu did not give his consent to search the car, allowing the inevitable discovery doctrine to admit evidence taken from the Chrysler will not weaken Fourth Amendment protections or incentivize police misconduct. *Silvestri*, 787 F.2d at 744. Therefore, the fruits

---

[12] The search-incident-to-arrest exception is even more fully supported by the facts here than the automobile exception. While the automobile exception requires probable cause that evidence of the crime will be found there, the search-incident-to-arrest exception only requires a "reasonable basis." *Compare Gant*, 129 S. Ct. at 1721 (automobile exception requires probable cause), *with* id. at 1719 (search-incident-to-arrest exception requires a "reasonable basis"). Thus, after Pascu's arrest, fewer facts needed to be known to officers to justify a search of the Chrysler under the search-incident-to-arrest exception than before Pascu's arrest under the automobile exception.

of officers' searches of the Chrysler need not be suppressed under the Fourth Amendment.

### 2. *Officers Legally Towed the Chrysler*

Finally, Pascu argues that officers did not have to tow the Chrysler, and therefore their inventory search of its contents at the police station was illegal and the fruits of the search should be suppressed.

Officers may tow a vehicle under the "community caretaking" exception to the Fourth Amendment's warrant requirement. That exception "allows the police to impound a vehicle for noninvestigatory purposes when it is reasonable to do so," *United States v. Sanchez*, 612 F.3d 1, 4 n.2 (1st Cir. 2010), under the totality of the circumstances. *United States v. Coccia*, 446 F.3d 233, 239 (1st Cir. 2006). Typical reasonable community caretaking purposes for impounding a vehicle include protection against vandalism or theft and safekeeping if the user is going to be indisposed for an indeterminate period of time, particularly when no other individual is immediately available to take custody of the vehicle. *See id.* at 240 (collecting cases).

Here, it was reasonable for officers to impound the Chrysler. Pascu was under arrest and would be indisposed for an indeterminate amount of time. *Cf. id.* (holding that it was reasonable for officers to impound a vehicle when the driver was taken away for a mental evaluation). Therefore, his car would

have appeared abandoned while he was in custody, and could become a target for vandalism or theft. *Cf. United States v. Ramos-Morales*, 981 F.2d 625, 626-27 (1st Cir. 1992) ("[T]he significant risk that an abandoned car will be stolen or damaged does not seem confined to busy streets, 'high crime' neighborhoods, or commercial parking lots."). No one else was immediately available to take custody of the vehicle: officers knew from looking up the license plate that the vehicle belonged to a man living in New York, Pascu had told them that he had driven to Cambridge alone, Roberta never showed up, and Pascu's wife and family lived in Romania. Thus, officers had substantial noninvestigatory reasons for impounding the Chrysler that were reasonable under the circumstances. *See, e.g.*, *Coccia*, 446 F.3d at 240 (holding that officers reasonably concluded that no one was immediately available to take custody of a defendant's car where the defendant only called his sister in Michigan and did not inform officers of any other means to remove the car).[13]

---

[13] Pascu's motion to suppress also suggests that because the Chrysler was in a private lot, it was not impeding traffic and therefore the officers' decision to tow it was unreasonable. In the First Circuit, there is no per se rule that such decisions to impound are unreasonable. *See Coccia*, 446 F.3d at 241 n.9 (noting that a defendant's assertion "that an impoundment of a car on private property is per se unreasonable under the community caretaking exception because the car is not impeding traffic" is "incorrect[]").

Therefore, Pascu's challenge to the authority of officers to impound his vehicle and perform an inventory search fails.[14]

### III. CONCLUSION

For the reasons set forth more fully above, I DENY Pascu's motion to suppress (Dkt. No. 13).

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[14] Pascu does not allege that the inventory search itself violated his Fourth Amendment rights, only that the officers' decision to impound his vehicle did.